IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| TERRANCE L. RANDLEMAN, Plaintiff, | ) |
| v. | ) |
| LOUISIANA SUGAR REFINING, LLC | ) No. ______________ |
| Defendant, | ) **JURY TRIAL DEMAND** |

COMPLAINT

## I. INTRODUCTION

1. This suit brought under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*., as amended, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., as amended, and Civil Rights Act of 1991, 42 U.S.C §§ 1981-1988. It is brought by Plaintiff, Terrance L. Randleman, for discrimination suffered by him while he was employed by Defendant, Louisiana Sugar Refining, LLC at the Louisiana Sugar Refining facility located at 1230 5th Ave, Gramercy, Louisiana 70052.

2. Mr. Randleman is a black man, who was 57 years old at the time of his wrongful discharge. Cargill, Incorporated handpicked him, to relocate to Louisiana and assist in the startup of the nation's first new sugar refinery in a century. Mr. Randleman had twice been chosen to relocate and assist in similar startup operations by Cargill, Inc., assignments for which he

relocated overseas temporarily. In line with his long career in the sugar industry, the entirety of Mr. Randleman's employment at the Louisiana Sugar Refining facility was characterized by his professionalism, strong leadership, and stellar record.

3. The Defendant engaged in a multitude of unlawful employment practices, including workplace discrimination on the basis of Mr. Randleman's age, race, and color, including persistent harassment, a hostile work environment, and retaliation which ultimately led to his wrongful discharge. His tenure at the Louisiana Sugar Refining facility was marked with harassment and a hostile work environment, including being subjected to swastikas and hangman's nooses, all of which went virtually unchecked. Mr. Randleman was subject to retaliation for speaking out over those unlawful employment practices. The Defendant acted with malice and reckless indifference with regard to the discrimination Mr. Randleman underwent while working at the Louisiana Sugar Refining facility.

4. Alternatively, notwithstanding Mr. Randleman's competency and experience in the industry, he was harassed over his age, frequently being made to feel that he was being pushed out or encouraged to retire. In the 7 months prior to his wrongful discharge he was shuffled around to four different positions, creating a significant amount of instability in his day to day work routine. Prior to that he was removed from his team lead position and told the company wanted to go younger, and then was asked when he was going to retire.

5. By engaging in unlawful employment practices and allowing a hostile and discriminatory workplace environment to continue the Defendant has violated Mr. Randleman's rights under the Age Discrimination in Employment Act, as amended, Title VII of the Civil Rights Act of 1964, as amended, by the Civil Rights Act of 1991, 42 U.S.C §§ 1981-1988.

## II. PARTIES

6. Plaintiff TERRANCE L. RANDLEMAN is a 59-year-old, black adult resident and citizen of Kenner, Louisiana, who moved to the area in 2010, after nearly two decades of stellar work performance for Cargill, Incorporated, to aid in the in the startup of the new Louisiana Sugar Refining facility, as he had done several times over his career with other facilities.

7. Defendant LOUISIANA SUGAR REFINING, LLC (hereafter referred to as "LSR, LLC" or "Defendant") is a foreign limited liability corporation based and doing business in St. James Parish, Gramercy, Louisiana. LSR operates as a joint venture between Cargill, Incorporated and Sugar Growers and Refiners, Inc. LSR operates the Louisiana Sugar Refining facility in Gramercy, Louisiana, and engages in the refining, production, and distribution of sugar to commercial and retail customers in the United States. The incidents giving rise to this Complaint occurred at the LSR refinery located in St. James Parish, Gramercy, Louisiana and in the Eastern District of Louisiana.

## III. JURISDICTION AND VENUE

8. The Court has subject matter jurisdiction over this action pursuant to 29 U.S.C. § 621 *et seq*., as amended, 42 U.S.C. § 2000e *et seq*., as amended, and 28 U.S.C. § 1331 (federal question jurisdiction).

9. Mr. Randleman has satisfied all conditions precedent to initiating this court action in that:

a. He timely filed a charge Equal Opportunity Commission of discrimination on the basis of his race (African-American), color (Black), and age (57), as well

as for retaliation;

b. The agency was not able to resolve the controversy; and

c. The agency issued a "right-to-sue" letter to Mr. Randleman, through undersigned counsel, dated January 17, 2017 and attached hereto as Exhibit 1, informing him that it was unable to resolve the controversy as described and that it was not prepared to take further efforts.

10. Venue is appropriate in this judicial district and in this court pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391, in that the employment practices and a substantial part of the events giving rise to this action occurred in within the Eastern District of Louisiana, and the employment records relevant to such practices are maintained and administered within the Eastern District of Louisiana.

## IV. BACKGROUND

### A. Purpose and Enforcement of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act

11. Congress passed Title VII of the Civil Rights Act of 1964 (Hereafter "CRA") in large part to prevent discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color..." Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1).

12. In 1967, Congress recognized the practice of age discrimination in the workplace and passed the Age Discrimination in Employment Act (Hereafter "ADEA") and declared the purpose of the Act "to promote employment of older persons based on their ability rather than age [and] to prohibit arbitrary age discrimination in the employment..." Age Discrimination in

Employment Act, 29 U.S.C. § 621 *et seq*., as amended.

13. In furtherance of the above stated goals, Congress enacted a formal process for aggrieved employees to seek redress for a violation their rights under either or both the ADEA and the CRA. First, by filing a charge with the Equal Opportunities Commission, and then, if allowed to proceed, by filing a complaint in a federal district court of the United States.

**B. Factual Allegations**

14. Mr. Randleman, a black man in his fifties at the time of his discharge, was employed by Cargill, Incorporated on or about August 29, 1998. Over the next twelve years, Mr. Randleman was a model employee, rising to management early in his career, and twice being chosen to assist in the startup and implementation of two new overseas sugar refineries.

15. Against the backdrop of being a proven team player and leader, and with the experience of successfully participating in the startup and implementation of two new sugar refineries, Mr. Randleman was selected by Cargill, Inc. to assist in the startup of the Louisiana Sugar Refining facility, the nation's first new sugar refinery in a century.

16. After accepting Cargill's offer to participate in the building and startup of the new LSR facility, in the Fall of 2010, Mr. Randleman, a native resident of Ohio, moved with his family to Kenner, Louisiana to begin work at the new LSR facility.

17. Mr. Randleman began his tenure at the LSR facility on or about October 9, 2010 as a packaging supervisor, after which time he began experiencing discrimination based on his race, color, and age. He was also met with an extremely hostile work environment. During the entirety of his tenure, white employees frequently and openly made derogatory statements about black people where black employees and supervisors could hear them, including frequently

commenting that black people had lower intelligence than their white counterparts. These statements were conveyed to Mr. Randleman, who verbally complained to John Stewart. Although management was aware of these comments, the white employees who made such statements faced no disciplinary action or consequences.

18. In the first year from October 2010 through 2011, Mr. Randleman observed several swastikas carved into the packaging area where he conducted his job. The swastika is widely recognized as the symbol of white supremacy and emblematic of Adolf Hitler's Nazi party which rose to power on a platform premised on white supremacy. Mr. Randleman complained about the swastikas to his supervisor, John Stewart. The swastikas remained on the premises.

19. In or around 2013, Mr. Randleman observed a hangman's noose in the facility. A supervisor of Mr. Randleman's dismissed any concern, stating that the hangman's noose "had been up there forever." Mr. Randleman once again complained to supervisor John Stewart. No immediate action was taken by superiors. The hangman's noose is emblematic of the history of lynching black Americans, particularly across the Southern United States, and is used to intimidate black people in pursuit of a white supremacist ideology and agenda.

20. In or around November, 2014, Mr. Randleman found a trashcan with the words "White Trash Only" spray-painted on. Mr. Randleman verbally complained about the graffiti to his supervisor, Dudley "Dutch" Melancon, stating that he felt the action was meant to evoke segregation era laws which prohibited blacks from using the same facilities as their white counterparts. His supervisor told him to wash off the trash can, and no further corrective action was taken by any of his superiors at the plant.

21. In or around June, 2015, Mr. Randleman walked into the control room where three white men were gathered and observed a hangman's noose hanging in the window of the control room. He verbally questioned the men, who denied having seen the noose. He then made a verbal complaint to his supervisor, Joel Van Timmerman, who asked him if he believed it was racially motivated. Mr. Randleman stated that he could not see a scenario where it was not racially motivated. Joel Van Timmerman responded that he would inform the human resources officer, Louis Abshire. The company held a five-minute diversity meeting, failed to conduct an investigation on the matter, and no further action was taken.

22. In or around 2014, LSR started a program, which upon information and belief was titled "Emerging Leaders/Silent Runners," in which those under the age of forty received specialized training as the "emerging leaders." The "Silent Runners" met once a year. During the "Silent Runners" meeting, the group of men over the age of 40 met briefly on the state of the company, and then proceeded to do skeet shooting for the remainder of the day. Despite having a desire to do so, Mr. Randleman was not invited to participate in the special training that was reserved for the "Emerging Leaders."

23. In or around February of 2015, Mr. Randleman was approached by his supervisor, Timmy Melancon, who told that him that he would be removed from his team lead position because "the company wanted to go younger." He was replaced by Isaiah Fricky who was a younger, white employee. Glen Faucheux, a white man, who was similar in age to Mr. Randleman, was allowed to remain in his team lead position.

24. After being removed from his team lead position, Mr. Randleman was moved three more times, for a total of four different position in an approximately seven-month period

prior to his discharge. In or around May of 2015, Mr. Randleman was moved back into the packaging warehouse and given less responsibility. Shortly after being moved into the packaging warehouse, his supervisor, Joel Van Timmerman, asked Mr. Randleman to attend lunch with him and another manager, Dudley "Dutch" Melancon. During that lunch, Joel Van Timmerman asked Mr. Randleman, "When do you plan on retiring?"

25. On October 10, 2015 Mr. Randleman was approached by a co-worker, Carl Bell, who complained to him that a white employee, Matt Schexnayder, made a comment describing a particular type of work as "nigger work." Mr. Randleman and Alex Olivier gave a verbal warning to Alex Schexnayder, and informed superiors. No further action was taken.

26. On October 12, 2015, Mr. Randleman and a co-worker, Vernon Lee, were involved in a minor verbal dispute, during which time Mr. Randleman called Mr. Lee a "suck ass." Mr. Randleman and Mr. Lee continued to work their shift with no further disputes arising.

27. On October 13, 2015, the human resources manager, Louis Abshire, requested that Mr. Randleman go to the human resources office for a meeting with Abshire and Gary Sellers. Mr. Randleman was informed that he would be escorted from the premises and was asked to return the following day for a meeting.

28. On October 14, 2015, Mr. Randleman and his wife returned to the LSR facility as Mr. Randleman had been instructed to do. Mr. Randleman and his wife were escorted to the visitor's center and once again met with Louis Abshire and Gary Sellers. When asked why Mr. Randleman was being removed, alternate explanations were given, with one man referencing the incident with Vernon Lee, and the other stating that it was wrong to call the separation a removal. The men presented Mr. Randleman with a separation agreement, which totaled

$25,076.46 plus reimbursement for health insurance payments for up to six months, which Mr. Randleman rejected. He was replaced by a white employee.

29. It was common practice at the LSR facility for black employees to face harsher disciplinary actions for minor infractions than their white counterparts.

30. But for the discrimination, harassment, and retaliation Mr. Randleman suffered, he would have continued his career with excellence, as evidenced by his exemplary and extensive work history.

31. Mr. Randleman suffered future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses as a result of the Defendant's conduct.

## V. CAUSES OF ACTION

### COUNT 1

**(Violation of Title VII of the Civil Rights Act of 1964 and a Violation of the Civil Rights Act of 1991: Discrimination on the Basis of Plaintiff's Race and Color – Disparate Treatment)**

32. Plaintiff, Mr. Randleman, incorporates herein by reference paragraphs 1-30, above.

33. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race or color…" 42 U.S.C. § 2000e-2(a)(1).

34. The Fifth Circuit Court of Appeals analyzes claims under the Civil Rights Act of 1991 together with Title VII claims.

35. To establish a claim for discrimination under Title VII of the Civil Rights Act of

1964, as amended, and the Civil Rights Act of 1991, plaintiff must show that he: (1) is a member of a protected class; (2) was qualified for his position; (3) was subjected to an adverse employment action; and (4) that similarly situated employees outside the protected class were treated more favorably.

36. As recounted in paragraphs 1-30 above, Mr. Randleman, is a black man with a stellar work history and a proven record of undertaking the type of work for which he relocated to undertake. He was regularly subjected to overt racism by white employees and those who were lighter skinned, including but not limited to the open display of hangman's nooses, the carving of swastikas on the factory walls, the spray-painting of a trashcan with the words "White Trash Only," and frequent reassignments within a short period of time.

37. While instances of discrimination and unlawful conduct were commonplace, no investigations were ever undertaken, and none of the white employees were ever disciplined; however, in contrast to white employees, black employees, including Mr. Randleman, were subjected to harsh discipline, such as dismissals for minor infractions.

38. Defendant's actions and failures to act, as set forth in this complaint were willful, reckless, and have harmed Mr. Randleman, and denied him his rights under 42 U.S.C. §2000e *et seq*. and 42 U.S.C §§ 1981-1988.

39. To have any economic deterrent effect on Defendant, Louisiana Sugar Refining, LLC, the court must issue appropriate injunctive relief, appropriate punitive penalties, and all relief herein prayed for that will deter the Defendant from perpetuating the violations forming the basis for this suit and committing future violations.

## COUNT 2

**(Violation of Title VII of the Civil Rights Act of 1964 and a Violation of the Civil Rights Act of 1991: Hostile Workplace Environment and Harassment)**

40. Plaintiff, Terrence L. Randleman, incorporates herein by reference paragraphs 1-30, above.

41. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race or color…" 42 U.S.C. § 2000e-2(a)(1). Courts have applied the Title VII bar to discrimination to apply to claims for hostile work environments.

42. To establish a hostile work environment, the Fifth Circuit Court of Appeals has set forth that a Plaintiff must prove he: (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

43. As recounted in paragraphs 1-30 above, Mr. Randleman, is a black man who was regularly subjected to overt racism by white employees and those who were lighter skinned, including but not limited to the open display of hangman's nooses, the carving of swastikas on the factory walls, the spray-painting of a trashcan with the words "White Trash Only," frequent reassignments within a short period of time, and ultimate dismissal.

44. While instances of discrimination and unlawful conduct were commonplace, and complained of by Mr. Randleman, no investigations were ever undertaken, and none of the white employees were ever disciplined; however, in contrast to white employees, black employees,

including Mr. Randleman, were subjected to harsh discipline, such as dismissals for minor infractions.

45. Defendant's actions and failures to act, as set forth in this complaint were willful, reckless, and have harmed Mr. Randleman, and denied him his rights under 42 U.S.C. § 2000e *et seq* and 42 U.S.C §§ 1981-1988.

46. To have any economic deterrent effect on Defendant, Louisiana Sugar Refining, LLC, the court must issue appropriate injunctive relief, appropriate punitive penalties, and all relief herein prayed for that will deter the Defendant from perpetuating the violations forming the basis for this suit and committing future violations.

**COUNT 3**

**(Violation of the Civil Rights Act of 1964: Retaliation by Discharge for Reporting Race and Color Discrimination)**

47. Plaintiff, Terrence L. Randleman, incorporates herein by reference paragraphs 1-30, above.

48. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race or color…" 42 U.S.C. § 2000e-2(a)(1).

49. To establish a prima facie case of retaliation, the Plaintiff, Mr. Randleman, must show that "(1) [h]e engaged in protected activity; (2) an adverse employment action occurred; [and] (3) a causal link exists between the protected activity and the adverse employment action."

50. As described more fully above, Mr. Randleman made several complaints to management during his employment at the Louisiana Sugar Refinery facility, with the final one

coming on October 10, 2015, when he verbally reprimanded a white employee for referring to a specific type of work as "nigger work." Mr. Randleman complained to his superior, John McKnight about the incident, but no disciplinary action beyond Mr. Randleman's reprimand occurred.

51. Three days following Mr. Randleman's complaint of the white employee's use of a derogatory racial epithet, he was discharged from his position at the facility.

52. Defendant's actions and failures to act, as set forth in this complaint were willful, reckless, and have harmed Mr. Randleman, and denied him his rights under 42 U.S.C. § § 2000e *et seq*.

53. To have any economic deterrent effect on Defendant, Louisiana Sugar Refining, LLC, the court must issue appropriate injunctive relief, appropriate punitive penalties, and all relief herein prayed for that will deter the Defendant from perpetuating the violations forming the basis for this suit and committing future violations.

**COUNT 4**

**(Violation of the Age Discrimination in Employment Act: Age Discrimination)**

54. The Age Discrimination in Employment Act makes it unlawful "to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1).

55. To establish a claim under the ADEA, the Plaintiff must establish age discrimination by showing that (1) was within a protected class; (2) was qualified for the position; (3) suffered an adverse employment decision; and (4) was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age.

56. As recounted in paragraphs 1-30 above, Mr. Randleman, was 57 years old when he was discharged. He had a stellar work history and a proven record of undertaking the type of work for which he relocated to undertake at the Louisiana Sugar Refining facility. He was frequently denied access to the training opportunities provided to those under the age of 40 who were placed in a program entitled "Emerging Leaders," while older employees were labeled "Silent Runners."

57. Mr. Randleman was removed from a position and told that the reason was that "the company wanted to go younger," and then within a short period of time was asked pointedly "when do you plan on retiring." When he was removed from his team lead position, a younger man, well below the age of 40 replaced him, and Mr. Randleman was ultimately placed in various positions, the last of which resulting in less responsibility.

58. Defendant's actions and failures to act, as set forth in this complaint were willful and have harmed Mr. Randleman, and denied him his rights under 29 U.S.C. § 621 *et seq*.

59. To have any economic deterrent effect on Defendant, Louisiana Sugar Refining, LLC, the court must issue appropriate injunctive relief, and all relief herein prayed for that will deter the Defendant from perpetuating the violations forming the basis for this suit and committing future violations.

**VI. JURY DEMAND**

60. Plaintiff demands a jury on all claims stated herein.

**VI. PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff, Terrance L. Randleman, respectfully prays that this Court grant it the following relief:

1. For back pay, with prejudgment interest, including fringe benefits and compensation for any negative tax consequences from October 15, 2015 to the date of judgment herein;
2. For front pay, for the period from the date of judgment to the date at which plaintiff could have continued in his position;
3. For compensatory damages;
4. For punitive damages in an amount appropriate to punish defendant and deter others from engaging in similar misconduct;
5. For injunctive relief, including but not limited to the full implementation of specific anti-discrimination policies, and for all other injunctive relief required to make plaintiff whole for the losses caused by the violations of the defendant;
6. For costs of suit, including reasonable attorney's fees and expert fees, pursuant to Title 42 United States Code Section 2000e-5(k) and other applicable laws; and
7. For such other and further relief as the court deems proper.

Respectfully submitted,

Mauricio Sierra (LA Bar # 35560)
The Sierra Firm, LLC
7214 St. Charles Avenue, Box 913
New Orleans, Louisiana 70118
MsierraLaw@gmail.com
Tel: (504) 864-7860
Fax: (504) 861-5986